**Christian Lambert**

    v.                                        Case No. 17-cv-341-PB
                                                  Opinion No. 2018 DNH 178
**US Social Security Administration,**
**Acting Commissioner**


**MEMORANDUM AND ORDER**

    Christian Lambert challenges the denial of his application
for disability insurance benefits pursuant to 42 U.S.C. §
405(g).  He contends that the Administrative Law Judge's ("ALJ")
decision denying his application should be reversed because his
residual functional capacity ("RFC") finding is not supported by
substantial evidence and fails to fully incorporate certain
manipulative limitations reflected in the medical record.
Lambert also argues that the ALJ erred by failing to resolve an
apparent inconsistency between vocational-expert testimony and
related information in the Dictionary of Occupational Titles
("DOT").  The Acting Commissioner, in turn, moves for an order
affirming the ALJ's decision.  For the reasons that follow, I
deny Lambert's motion and affirm the Acting Commissioner's
decision.

## I.   **BACKGROUND**

Lambert is a 45 year-old man with a high school education. See Administrative Transcript ("Tr.") 26, 204.  He previously worked at Walmart from 2001 to 2006, as the manager of the electronics department, and then at Time Warner Cable from 2006 to 2015, as a customer service technician.  Doc. No. 9 at 2; see Tr. 204, 209.  Lambert has allegedly been disabled since March 16, 2015, due to Charcot-Marie-Tooth disease ("CMT"), a disease that he has had since he was 18 years-old.  See Tr. 44, 46-47, 56-57.[1]

Lambert's application for benefits was initially denied in October 2015.  Tr. 86-97.  His claim progressed to a hearing before ALJ Paul G. Martin in January 2017, where Lambert was represented by counsel.  His claim was ultimately denied by the ALJ in a written decision issued on March 1, 2017.  Doc. No. 9 at 1; see Tr. 18-28.  On May 31, 2017, the Social Security Administration ("SSA") Appeals Council denied Lambert's request for review of the ALJ's decision, making it the final decision of the Acting Commissioner and ripe for judicial review.  See Tr. 1-7.  Lambert now appeals.

---

[1] In accordance with Local Rule 9.1, the parties have submitted a joint statement of stipulated facts, (Doc. No. 9).  See LR 9.1. Because that joint statement is part of the court's record, I only briefly recount the facts here.  I discuss further facts relevant to the disposition of this matter as necessary below.

## II.  **THE ALJ'S DECISION**

The ALJ assessed Lambert's claim under the five-step, sequential analysis required by 20 C.F.R. § 404.1520.  He ultimately ended the inquiry by finding that Lambert was not disabled at step five[2] because he "was capable of making a successful adjustment to other work" existing in significant numbers in the national economy.  Tr. 27.  At step one, the ALJ found that Lambert had not engaged in substantial gainful activity since March 16, 2015, his alleged disability onset date.  Tr. 20.  At step two, he found that Lambert's Charcot-Marie-Tooth disease ("CMT") was a severe impairment.  Id. "[A]lso described as hereditary peripheral neuropathy," CMT "primarily affects the lower and upper extremities," see id., particularly Lambert's "fine and gross motor coordination as well as his balance and his gait."  Tr. 38.  At step three, the ALJ found that Lambert's CMT did not qualify as a listed impairment as set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id.; see 20 C.F.R. § 404.1520(d), 404.1525, and

---

[2] Step five requires a finding of "not disabled" and a denial of the claimant's application if the Commissioner produces "evidence of specific jobs in the national economy that the applicant can still perform" given his or her RFC, education, work experience, and age.  Purdy v. Berryhill, 887 F.3d 7, 10 (1st Cir. 2018); see 20 C.F.R. § 404.1520(a)(4)(v).

404.1526, which would have rendered him disabled per se.  Tr. 21.

At step four, the ALJ determined that Lambert had the RFC to perform "light work," as defined in 20 C.F.R. § 404.1567(b), except that he could only stand and/or walk for up to two hours in an eight-hour workday, and could only sit for up to six hours total.  Tr. 21.  The ALJ also found that Lambert could "occasionally climb, stoop, kneel, crouch and crawl," but that he could "never balance" or "climb ladders, ropes or scaffolds." Id.  He further found that Lambert must "avoid hazardous machines and heights . . . all writing other than signatures," and must also "avoid competitive keyboarding and repetitive handling."  Id.  In making his determination, the ALJ "considered all symptoms" as evidenced by treatment notes, clinical examinations, Lambert's reported daily activities, and his own subjective complaints.  See Tr. 21-26.  These symptoms primarily included "tremor and hand limitations, and weakness, numbness and pain in his lower extremities associated with activity," which made it difficult for him to stand, walk and, balance.  See Tr. 22.  His "bilateral drop foot" caused him to regularly "trip" over himself when walking and feel unsteady on his feet.  See Tr. 22, 51-52.  Lambert also claimed to experience loss of sensation in his hands and decreased strength in his fingers.  He testified that "due to shakiness and poor

motor control, he [had] difficulty gripping a pencil or doing tasks such as opening food containers," and that he had "poor handwriting" that "improve[d] if he [wrote] slowly." Tr. 22, 51-53. He also testified that he experienced difficulty typing but said that he could use the "hunt and peck" typing method. Tr. 22, 56, 62.

Although the ALJ found that CMT "could reasonably be expected to cause [Lambert's] alleged symptoms," he found that Lambert's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." Tr. 22. The ALJ found that the medical record did indicate progressive symptoms of "pain or discomfort, numbness, tremors and weakness, as well as ankle or gait instability," collectively "limiting his tolerance for prolonged standing and walking and some postural activities, as well as repetitive handling." Tr. 22. But the ALJ also found evidence that Lambert retained "basic functions with the hands[,] such as manipulating utensils and 'hen peck' typing," and that he could "manage[] short periods of standing and walking with use of boots." Tr. 22; see Tr. 56. Lambert's activities of daily living cited by the ALJ included "working part-time as a caretaker for individuals with developmental disabilities . . . shopping, limited yard work with help from his son, caring for

5

his dogs, taking out the trash, preparing meals, and visiting friends . . . watching television . . . and play[ing] computer games." Tr. 22, 217-224. In light of these findings, and testimony from a Vocational Expert ("VE") considering Lambert's relevant description and work experience, the ALJ concluded Lambert was unable to perform his past relevant work as a "retail department manager and customer service representative." Tr. 26.

At step five, however, the ALJ concluded that Lambert was "capable of making a successful adjustment to other work that exist[ed] in significant numbers in the national economy," and that a finding of "not disabled" was therefore warranted under 20 C.F.R. § 404.1520(a)(4)(v). Tr. 27. The ALJ based his conclusion on the testimony of a VE taken at the January 2017 hearing, who considered a hypothetical person with Lambert's age, education, work experience, and RFC. Tr. 27, 65-74. When questioning the VE, the ALJ recited the aforementioned RFC to the VE, placing particular emphasis on "a need to avoid all writing other than maybe a signature or something similar," and a need to avoid "competitive paced keyboarding and repetitive handling." Tr. 68. When asked by the VE to clarify the meaning of "repetitive handling," i.e. whether it meant "occasional" or "frequent," the ALJ responded: "Repetitive in terms of—in the truest sense of repetitive, not in terms of frequent or

occasional, but more the ability to do so for a long[,] prolonged period, over and over." Tr. 68. The VE, understanding repetitive to mean "repeating the same types of motion over and over again," see Tr. 68, then opined that such a person could perform work as a "ticket taker," a "telephone solicitor," or a "final assembler [of] optical goods." Tr. 69-71. The VE further testified that those three jobs existed in the national economy at levels of 73,000; 72,000; and 14,000 positions, respectively. See 69-71. The ALJ cited to this testimony in his March 2017 decision and noted that he had determined it to be "consistent with the information contained in the Dictionary of Occupational Titles," as required by Social Security Ruling 00-4p. Tr. 27. Accordingly, in considering the availability of those 159,000 positions consisting of either "light" or "sedentary" work that Lambert could still perform, the ALJ found that Lambert had not been disabled from the onset date through the date of the decision. Tr. 27 (citing 20 C.F.R. § 404.1520(g)).

### III. STANDARD OF REVIEW

I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner. See 42 U.S.C. § 405(g). That review is limited,

however, "to determining whether the [Commissioner] used the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). I defer to the Commissioner's findings of fact, so long as those findings are supported by substantial evidence. Id. Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). If the Commissioner's factual findings are supported by substantial evidence, they are conclusive, even where the record "arguably could support a different conclusion." Id. at 770.

If, however, the Commissioner derived her findings by "ignoring evidence, misapplying the law, or judging matters entrusted to experts," her findings are not conclusive. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curium). "Issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Commissioner, and the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for her, not for the doctors or for the courts." Purdy v.

Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (internal quotations
and citations omitted).

## IV.   ANALYSIS

Lambert alleges two errors with the ALJ's decision that he
argues warrant reversal.  Doc. No. 6.  First, he contends that
the ALJ's RFC determination is not supported by substantial
evidence because it fails to "fully incorporate manipulative
limitations" reflected in Lambert's medical record.  Doc. No. 6
at 8.  Second, Lambert argues that the ALJ failed to resolve
apparent inconsistencies between the VE's testimony regarding
Lambert's ability to perform certain light and sedentary work
and the description of those positions contained in the DOT.
Accordingly, Lambert argues that SSR 00-4p precluded the ALJ
from relying on that testimony to support his finding of "not
disabled" at step five.  I address each of Lambert's arguments
in turn.

## A.    Substantial Evidence Supporting the ALJ's RFC Finding

Lambert contends that the ALJ's step-four RFC finding is
not supported by substantial evidence.  To reiterate, the ALJ
found that Lambert could perform "light work," except that he
(i) could only stand and/or walk up to two hours in an eight-
hour workday and up to six hours total, (ii) could only
occasionally climb, stoop, kneel, crouch and crawl, (iii) could
never balance, (iv) could not climb ladders, ropes, or

scaffolds, (v) must avoid hazardous machines and heights, and
(vi) must avoid "all writing other than signatures,"
"competitive paced keyboarding," and "repetitive handling."  Tr.
21.  Lambert contends that ALJ erred in failing to discuss
certain medical findings in his step-four narrative related to
Lambert's deficits in his upper extremities, and in defining too
narrowly Lambert's manipulative limitations in constructing the
above RFC.  Doc. No. 6 at 8-12.  For the reasons discussed
herein, I see no legal error in the ALJ's step-four analysis and
find that his RFC determination is supported by substantial
evidence.

A claimant's RFC is "the most [the claimant] can still do
despite [her] limitations."  20 C.F.R. § 404.1545(a).  It must
be crafted by the ALJ based on all relevant evidence in the
record.  20 C.F.R. § 404.1545; see Lord v. Apfel, 114 F. Supp.
2d 3, 13 (D. N.H. 2000); Stephenson v. Halter, 2001 DNH 154, *2.
In so doing, the ALJ "must consider limitations and restrictions
imposed by all of an individual's impairments."  Stephenson,
2001 DNH 154, *2 (citing SSR 96-8p, 1996 WL 374184 at *5 (S.S.A.
July 2, 1996)).  This is typically done by "piec[ing] together
the relevant medical facts from the findings and opinions of
multiple physicians," see Evangelista v. Sec'y of Health & Human
Servs., 826 F.2d 136, 144 (1st Cir. 1987), but may sometimes
incorporate "commonsense judgments about functional capacity"

based upon those findings.  Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990).  An ALJ's written decision, however, need not specifically address every individual piece of evidence in the record where it would be cumulative or unhelpful to the claimant's position.  See Grenier v. Colvin, 2015 DNH 133 at *2; Lord, 114 F. Supp. 2d at *13; see also Rodriguez v. Sec'y of Health & Human Servs., 915 F.2d 1557, 1990 WL 152336, at *1 (1st Cir. 1990) (per curiam, table decision) ("An ALJ is not required to expressly refer to each document in the record, piece-by-piece.").

Here, the ALJ formulated Lambert's RFC by piecing together several source opinions from the record.  He first gave "great weight" to the opinions of Dr. Peter Loeser and Dr. Elaine Hom. Tr. 23.  Dr. Loeser, a consultative physician for the state, physically examined Lambert on September 18, 2015.  See Tr. 276-79.  Although no documentation of a CMT diagnosis appeared in the record at the time, Dr. Loeser found neurological symptoms "consistent with [Lambert's] reported diagnosis of CMT" and noted that Lambert reported experiencing those symptoms at a relatively consistent level for as long as twenty-four years. Tr. 276.  As to Lambert's upper extremities, these symptoms included "[m]ild tremor in the extremities both at rest and with movement, with mild muscle spasticity with movement."  Tr. 278. Other than that, Dr. Loeser indicated an "unremarkable upper

extremity examination." Id.  He found that Lambert had
"[n]ormal power, strength, and fine touch sensation in the upper
extremities bilaterally, including pinch, grip, dexterity, and
alternating movements." Id.  The ALJ recited these findings in
his step-four narrative, giving them great weight, and also
noted that Dr. Loeser "specified no hand functional
limitations." See Tr. 23, 25.  The ALJ also gave great weight
to the nonexamining opinion of Dr. Hom, a state consultative
physician who rendered an opinion on Lambert's RFC after
reviewing his medical record on October 13, 2015, which included
Dr. Loeser's physical exam.  Tr. 25, 88-93.  Dr. Hom considered
Lambert's history of CMT, which she found caused "severe"
peripheral neuropathy and Lambert's related functional troubles.
Tr. 89.  She opined that notwithstanding his CMT impairment, he
could still stand and/or walk for a total of two hours and sit
for a total of six hours in an eight-hour workday, and that he
could occasionally lift and carry up to 20 pounds and frequently
lift and carry up to 10 pounds.  Tr. 90.  She also found that he
could only occasionally climb ramps and stairs, occasionally
stoop, kneel, crouch, and crawl, but could never climb ladders,
ropes, or scaffolds, and could never balance.  Tr. 90-91.  She
also opined that Lambert should avoid even moderate exposure to
hazardous machinery and heights, but that Lambert had no
manipulative limitations.  Tr. 91.  The ALJ explained that both

consultative opinions were entitled to "great weight" because
they were based upon the "detailed" physical examination by Dr.
Loeser, were consistent with treatment notes and Lambert's own
reported abilities from periods both before and after the
examination and RFC opinion, and because of Dr. Hom's SSA
"program knowledge." Tr. 25. Consequently, the ALJ adopted Dr.
Hom's RFC finding almost entirely, incorporating her opinions as
to Lambert's postural and environmental limitations into his own
RFC verbatim. See Tr. 21. Thus, these opinions provide
substantial evidence supporting the ALJ's RFC finding with
respect to Lambert's ability to perform "light work" with the
first five limitations discussed above. See 20 C.F.R. §
404.1567(b) ("Light work involves lifting no more than 20 pounds
at a time with frequent lifting or carrying of objects weighing
up to 10 pounds . . . a good deal of walking or standing, or . .
. sitting most of the time with some pushing and pulling of arm
or leg controls.").

The ALJ's RFC only departed from Dr. Hom's with respect to
manipulative limitations. Although Dr. Hom found no
manipulative limitations, the ALJ found that Lambert could not
write, "competitively type," or "repetitively handle." Tr. 21.
The ALJ determined that these limitations specifically related
to Lambert's tremors, which were "not fully addressed" by Dr.
Hom but were raised in subsequent examination records from

13

Lambert's treating neurologist.  See Tr. 26.  For instance, on
April 27, 2016, Lambert was first seen by Dr. Justin Mowchun, a
neurologist to whom he was referred after seeking medical
treatment for his suspected CMT for the first time in January
2016.  Tr. 23; Doc. No. 9 at 4 (citing Tr. 286, 325-27).  Dr.
Mowchun diagnosed Lambert with CMT.  Tr. 325-27.  In his step-
four narrative, the ALJ discussed various portions of Dr.
Mowchun's examination notes, specifically Lambert's reported
"numbness and tingling in his feet," "his history of weakness
and tremor in his hands, with difficulty writing," and the
presence of "a moderate postural tremor" when his arms were
extended, and an "action tremor" when Lambert attempted to touch
his finger to his nose.  Tr. 23 (citing Tr. 325-27).  He also
discussed Lambert's strength, grip, and finger-abduction, as
tested by Dr. Mowchun, which were assessed as five-out-of-five,
four-plus-out-of-five, and four-out-of-five, respectively.  Tr.
23, 326.  Finally, the ALJ noted Dr. Mowchun's conclusion that
"the exam and nerve conduction studies were consistent with CMT,
with severe generalized peripheral neuropathy," for which Dr.
Mowchun recommended physical therapy, and discussed possible
medications to help alleviate foot pain and tremor.  Tr. 23,
326-27.  He also suggested podiatry as a possible means for
addressing the symptoms experienced in Lambert's lower
extremities.  Tr. 23, 326-27.

Consequently, Lambert began seeing podiatrist Heidi
Newkirk, DPM, in May 2016, who assessed his CMT-related
hammertoe deformities, gait abnormalities, and foot pain.  See
Tr. 283-84.  In July 2016, pursuant to Dr. Newkirk's suggestion,
Lambert underwent left-foot surgery to help alleviate his
chronic pain.  See Tr. 281, 308-10.  Between August 2016 and
November 2016, Lambert presented to Dr. Newkirk for several
surgical follow-up examinations.  See Doc. No. 9 at 6-7.  In a
November 22, 2016, evaluation, Dr. Newkirk noted that Lambert's
foot was stable, and that he should continue ambulating as
tolerated.  Tr. 346.  She also noted that she would be "happy to
fill out the podiatrically relevant portion" of disability
paperwork recently received by her office, and that she was
referring Lambert to physical therapist Joan Van Saun "for a
formal evaluation of [his] functional capacity."  Tr. 346-47.

Pursuant to that referral, Lambert underwent a functional
capacity evaluation on November 30, 2016, by Joan Van Saun, a
licensed occupational therapist.  Tr. 351-54; see Doc. No. 9 at
7.  Van Saun, began by noting Lambert's subjective symptom
report, which for the upper extremities included "gross and fine
motor tremor," with "[d]ifficulty zipping, buttoning, putting on
socks and shoes, cutting vegetables, [and] opening containers."
Tr. 351.  Based on Lambert's description of his home activities,
Van Saun found less-than-normal functioning in "personal"

activities, such as dressing and bathing; "home maintenance";
"general mobility"; "homemaking"; and "functional mobility."
Tr. 352.  She also performed a physical examination on Lambert,
testing for range of motion and strength in his upper and lower
extremities, lifting and carrying capacity, pushing and pulling
capacity, fine motor coordination, and positional tolerances,
*inter alia*.  Tr. 352.  As to Lambert's upper extremities, Van
Saun found that his range of motion was within normal limits,
and that his strength was five-out-of-five "throughout except
intrinsic musculature, e.g. digits 2 through 5 abduction and
abduction 4/5 on manual muscle testing."  Tr. 352.  She also
found that he had a "moderate tremor" when his hands were
extended, and that his "fine motor coordination [was]
significantly impaired."  Tr. 352.[3]  Van Saun ultimately opined
that Lambert's work capacity was "Below Sedentary . . . due to
[his] decreased upper extremity fine and gross motor
coordination, balance impairment, [and] gait abnormalities."
Tr. 353.  She explained that "[e]ven if [a] job involves
primarily sitting, limitations in upper extremity fine and gross
motor coordination would prevent him from performing tasks such

---

[3] Lambert also completed a "nine-hole peg test" at a slow pace
with "uncoordinated arm and hand movement."  Tr. 353.  Van Saun
further noted that Lambert had "slight difficulty with in-hand
manipulation," and "mild dysmetria with hand to nose testing."
Tr. 353.

as competitively-paced keyboarding, handwriting, [and] repetitive handling tasks." Tr. 353. On January 18, 2017, Dr. Newkirk signed a one-line document asking her whether the results of Van Saun's evaluation represented "an accurate estimate of Christian Lambert's ability to sustain work for a standard work week." Tr. 355. She checked a box labeled "yes" without further explanation or comment. Id.

The ALJ extensively discussed the aforementioned treatment notes and evaluation in his step-four narrative. Tr. 22-25. He assigned "little weight" to Van Saun's evaluation and the opinions contained therein, as well as Dr. Newkirk's opinion affirming Van Saun's conclusions.[4] Tr. 25-26. The ALJ found Van Saun's sub-sedentary opinions entitled to "little weight" because "she did not specifically state the amount of weight [Lambert could] lift and carry," and because much of her opinion was based on Lambert's own "self-reported ability to work in his current job" rather than her own "independent evaluation." See Tr. 25. He also found that her opinion "somewhat overstate[d] the objective findings noted in her exam summary"; "lack[ed] some detail about the duration and extent of testing"; and was "inconsistent with [Lambert's] activities of daily living, and the signs and symptoms reflected in [his] longitudinal medical

---

[4] Dr. Mowchun did not render an opinion regarding Lambert's functional capacity.

17

record." Tr. 26. The ALJ also explained, however, that he was
adopting Van Saun's opinion with respect to the tremor-related
limitations because they were not addressed by Dr. Hom but were
consistent with Dr. Mowchun's exam records. Tr. 26. Thus, the
components of the ALJ's RFC finding relating to Lambert's
inability to write, competitively type, and repetitively handle,
as taken directly from Van Saun's evaluation, are also supported
by substantial evidence.

Lambert argues that the ALJ's analysis was flawed for two
reasons. Both are without merit. First, he challenges the
ALJ's consideration of Dr. Mowchun's examination notes as
discussed above. He argues that key components of Dr. Mowchun's
notes relating to his hand function were omitted from the ALJ's
step-four discussion. See Doc. No. 6 at 9-10. Specifically, he
refers to the results of the Electromyogram ("EMG") nerve
conduction studies noted by Dr. Mowchun, which showed "reduced
amplitude distally" and "significantly reduced" conduction
velocity across Lambert's right wrist. Doc. No. 6 at 10 (citing
Tr. 342-43). Although he accurately points out that the ALJ's
written decision does not recite every specific finding
contained in Dr. Mowchun's examination notes, compare Tr. 23,
with Tr. 342-43, Lambert simply fails to demonstrate any legal
error in those omissions. The ALJ was not obligated to "address
every piece of evidence in the administrative record." See

Lord, 114 F. Supp. 2d at 13.  As long as an ALJ's decision is
supported by substantial evidence, it need only "'take into
account whatever in the record fairly detracts from its
weight.'"  See Diaz v. Sec'y of Health & Human Servs., 791 F.
Supp. 905, 912 (D. P.R. 1992) (quoting Universal Camera Corp. v.
Nat'l Lab. Relations Bd., 340 U.S. 474, 488 (1951)).  Thus, an
ALJ need not address any particular piece of evidence if it
would be cumulative of that already discussed.  See Rodriguez,
915 F.2d 1557, 1990 WL 152336, at *1-4 (per curiam, table
decision).  The ALJ's discussion of Dr. Mowchun's examination
notes was more than sufficient to satisfy his obligations.  The
ALJ devoted a full paragraph to Dr. Mowchun's findings from his
only examination of Lambert in April 2016.  Tr. 23.  Although he
omitted mention of the specific results of the nerve conduction
studies, as Lambert claims, the ALJ explicitly considered Dr.
Mowchun's conclusion that those results were "consistent with
CMT, with severe generalized peripheral neuropathy."  Tr. 23,
343.  Moreover, Dr. Mowchun's assessment of those reports was
consistent with Dr. Hom's opinion, which was given great weight
by the ALJ, that Lambert suffered from "severe" peripheral
neuropathy in his upper extremities.  See Tr. 89.  Thus,
specific recitation of the underlying studies on which Dr.
Mowchun's assessment was based would have been unnecessarily
cumulative, and I find no error.  See Quigley v. Barnhart, 224

19

F. Supp. 2d. 357, 369 (D. Mass. 2002) ("[T]here is a presumption that an ALJ has considered all of the evidence before him.")

Lambert also argues that the ALJ erred by failing to incorporate manipulative limitations into the RFC "that fully encompass the severity of" Lambert's impairment. See Doc. No. 6 at 11. This argument warrants little discussion, as Lambert has not presented any evidence supporting further manipulative limitations than those reflected in the ALJ's RFC. The only evidence in the record supporting any manipulative limitations is Van Saun's functional evaluation finding that Lambert's "fine and gross motor coordination would prevent him from performing tasks such as competitively-paced keyboarding, handwriting, [and] repetitive handling tasks." Tr. 353. The ALJ accurately incorporated those three limitations directly into his RFC. His finding with respect to those limitations is therefore supported by substantial evidence. To the extent Lambert argues that Van Saun's reference to those restrictions was only used as a series of "examples" and that the ALJ should have "expanded" upon them by adopting broader restrictions, his argument is unavailing. He cites to no authority to support his assertion that an ALJ under these circumstances is obligated to "expand" upon specific functional limitations to make them more general. In fact, as a lay person, an ALJ is typically unqualified to adopt functional limitations beyond those supported by expert evidence. See

Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17
(1st Cir. 1996); Jenna v. Colvin, 2014 DNH 074, *4 (ALJ's
finding that claimant was limited in use of his left hand was
unsupported by substantial evidence where no credited medical
opinion addressed hand limitations).  Thus, I find no error.

B.   **Apparent Inconsistencies Between VE Testimony & DOT**

Next, Lambert argues that the ALJ erred in relying on the
VE's testimony to support his finding that Lambert could perform
certain representative jobs at step five because there were
apparent inconsistencies between the VE's testimony and the
description of those jobs contained in the DOT.  Although I
agree with Lambert that the ALJ erred in failing to clarify one
of those alleged inconsistencies, the error was harmless for the
reasons that follow.

In considering "occupational information," i.e. whether
jobs exist that a claimant can perform, the SSA relies upon the
DOT and related publications "for information about the
requirements of work in the national economy."  See SSR 00-4P,
2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000).  It will also
typically consider vocational-expert testimony about the
requirements of a job or occupation.  "When there is an apparent
unresolved conflict between" the VE's evidence and occupational
information in the DOT, the ALJ "must elicit a reasonable
explanation" from the VE before relying on that evidence to

support a determination as to the claimant's disability.  See
id.  The ALJ has an affirmative duty to ask the VE whether his
or her testimony conflicts with the DOT, and the obligation to
resolve any such conflict before relying upon the conflicted
evidence.  Id. at *2, *4.  Although the ALJ may resolve the
conflict in favor of the VE if a reasonable explanation is
provided, he or she may not rely upon the VE's evidence "if that
evidence is based on underlying assumptions or definitions that
are inconsistent with [applicable] regulatory policies or
definitions." See id. at *2-3.  The ALJ must then explain how
"he or she resolved the conflict" in the written decision.  See
id. at *4.

     Here, Lambert alleges that there was an apparent
inconsistency between his inability to "repetitive[ly]
handl[e]," as assumed in the hypothetical considered by the VE,
and the DOT's description of the jobs that the VE said Lambert
could still perform.  Because the ALJ never affirmatively asked
the VE to clarify the inconsistency and resolved it accordingly,
Lambert argues that the ALJ erred in relying upon the VE's
testimony and his step-five finding is therefore unsupported by
substantial evidence.  The jobs discussed by the VE consisted of
telephone solicitor, eye-glass assembler, and ticket seller.
According to the DOT, each job requires the ability to perform
either *occasional*, *frequent*, or *constant* "handling,"

respectively.  See DOT 299.357-014, 1991 WL 672624 ("Telephone

Solicitor"); DOT 713.687-018, 1991 WL 679271 ("Final Assembler,

Optical Goods"); DOT 211.467-030, 1991 WL 671853 ("Ticket

Seller").

The DOT describes how frequently job requirements must be

performed by exclusively using those three terms.  In its

"companion publication," the Selected Characteristics of

Occupations ("SCO"), see 20 C.F.R. § 404.1566(d); SSR 00-4P,

2000 WL 1898704 (Dec. 4, 2000), at *1, all three frequencies are

specifically defined.  See Selected Characteristics of

Occupations Defined in the Revised Dictionary of Occupational

Therapy ("SCO"), App. C.  "Occasional handling" requires the

ability to handle "up to 1/3 of the time, whereas "frequent

handling" requires the ability to handle "from 1/3 to 2/3 of the

time," and "constant handling" requires the ability to handle

"2/3 or more of the time."  Id.

"Repetitive handling," which is not used in the DOT, was

defined by the ALJ at the hearing to mean "the ability to do so

for a long prolonged period, over and over," see Tr. 68, and the

ALJ explicitly differentiated it from occasional and frequent.

Id.  Thus, as the Acting Commissioner appears to concede, see

Doc. No. 8-1 at 8-9, "repetitive handling," as its natural

meaning would suggest, is consistent, if not synonymous with

"constant handling."  See, e.g., Cunningham v. Colvin, 46 F.

Supp. 3d 26, 33-34 (D. D.C. 2014) (ALJ's finding that claimant must avoid "constant handling and repetitive fine manipulation" not inconsistent with expert opinion that she should avoid "repetitive handling"). Naturally, performing a task over and over would amount to "2/3 or more of the time" under most circumstances. Thus, the VE's opinion that Lambert could work as a ticket seller despite his inability to constantly handle does appear to conflict with the DOT's description of that position, which requires constant handling. See DOT 211.467-030, 1991 WL 671853 ("Ticket Seller"). The ALJ therefore plainly erred in failing to ask the VE to clarify that discrepancy and in failing to resolve it in accordance with SSR 00-4p. See SSR 00-4p, 2000 WL 1898704, at *2-4. Consequently, he also erred in relying upon that evidence in making his final disability determination. See id. But, this error does not necessarily warrant remand.

The ALJ did not solely rely upon the VE's ticket-taker testimony in finding that Lambert was not disabled. The VE also opined that a hypothetical person matching Lambert's description could perform the representative jobs of "telephone solicitor" and "final assembler [of] optical goods," both existing nationally in 72,000 and 14,000 respective positions. Tr. 70-71; see Tr. 27. The ALJ cited this evidence in finding that Lambert was capable of making a successful adjustment to other

24

work and was therefore "not disabled." Tr. 27. His error in relying upon the VE's testimony regarding the "ticket taker" opinion does not necessarily taint his reliance upon the opinion regarding these two other positions. For instance, the DOT describes telephone solicitor as requiring only "occasional handling," and eye-glass assembler as requiring only "frequent handling." See DOT 299.357-014, 1991 WL 672624 ("Telephone Solicitor"); DOT 713.687-018, 1991 WL 679271 ("Final Assembler, Optical Goods"). Because "repetitive" is essentially synonymous with "constant," the inability to repetitively handle would not necessarily preclude the performance of occasional or frequent handling, as they are both less demanding frequencies. See Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Therapy ("SCO"), App. C. Not only did the ALJ explicitly disassociate his use of the term "repetitive" with "frequent" or "occasional," see Tr. 68, but even on its face, a restriction from "repetitive performance" of an activity does not necessarily preclude "frequent" or "occasional" performance of that activity. See, e.g., LeFevers v. Comm'r of Soc. Sec., 476 F. Appx 610, 611 (6th Cir. 2012) (claimant's inability to perform "repetitive" lifting did not preclude claimant from performing "frequent" lifting); Renfrow v. Astrue, 496 F.3d 918, 921 (8th Cir. 2007) ("[F]requent reaching and handling requirements are not equivalent to

repetitive use of the right hand."). Thus, the VE's opinion that a hypothetical person matching Lambert's description could perform work as a telephone solicitor or eye-glass assembler despite an inability to "repetitively handle" is not in conflict with the descriptions of those jobs appearing in the DOT. Accordingly, the ALJ was not precluded from relying on the VE's testimony with respect to those positions.[5]

Furthermore, that portion of the VE's testimony alone establishes substantial evidence for the ALJ's step-five findings. At step five, the SSA need only identify a single occupation existing in significant numbers in the national economy that the claimant can perform to establish that he or she is not disabled. 20 C.F.R. § 404.1566(b). "Significant numbers" have been found at levels lower than 200. See, e.g., Brown v. Barnhart, No. 03-44-B-W, 2004 WL 413305, at *5-6 (D. Me. Mar. 3, 2004) adopted by 2004 WL 1572695 (D. Me. Apr. 5, 2004) and aff'd, 126 Fed. Appx. 495 (1st Cir. 2005) (collecting cases where numbers were sufficiently "significant"). Here, the VE testified that a person with the limitations identified in Lambert's RFC could perform the job of telephone solicitor and

---

[5] Because there was no conflict between the DOT and this portion of the VE's testimony, the ALJ's failure to ask the VE whether any conflict existed was harmless, see Renfrow, 496 F.3d at 921 (8th Cir. 2007), and nothing would have prevented him from resting his holding on that evidence alone.

that 72,000 such positions existed nationally. Tr. 70. He also testified that such a person could perform work as an eye-glass assembler, and that 14,000 of those jobs existed nationally. Tr. 70-71. This evidence of 86,000 positions nationally was more than sufficient to establish the existence of a "significant number" of jobs that Lambert could perform, see, e.g., Jones v. Barnhart, 315 F.3d 974, 979 (8th Cir. 2003) (75,000 jobs nationwide establishes existence of "substantial gainful work which exists in the national economy), and the ALJ explicitly cited to this testimony in support of his step-five conclusion. See Tr. 27. Therefore, even if the ALJ had appropriately identified the aforementioned conflict and resolved it by finding that Lambert was unable to perform work as a ticket taker, his finding that Lambert was capable of making an adjustment to jobs existing in significant national numbers would have still been supported by substantial evidence. Accordingly, his error in failing to discover and resolve the aforementioned ticket-taker conflict is harmless, and remand is inappropriate under these circumstances.

## V.  CONCLUSION

Because I find that the ALJ's RFC is supported by substantial evidence and that he derived his findings appropriately, for the reasons set forth above, I grant the

27

Acting Commissioner's motion to affirm (Doc. No. 8), and I deny

Lambert's motion to reverse and remand (Doc. No. 6).  The clerk

is directed to enter judgment accordingly and close the case.

SO ORDERED.

/s/ Paul Barbadoro_____
Paul Barbadoro
United States District Judge

September 5, 2018

cc:  Craig A. Jarvis, Esq.
     Robert J. Rabuck, Esq.